TRANSPAC DRILLING VENTURE 1982-16, ROBERT SEIDMAN AND MARK D. LIPSKY, PARTNERS OTHER THAN THE TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Transpac Drilling Venture 1982-16 v. Commissioner
Docket Nos. 2260-90, 2418-90, 5791-90, 5830-90, 5927-90, 6015-90, 6083-90, 6109-90, 6141-90, 6143-90, 6145-90, 6147-90, 6149-90, 6168-90, 6276-90, 6317-90, 6355-90, 6448-90, 6487-90, 6730-90, 2417-90, 5790-90, 5792-90, 5926-90, 6014-90, 6017-90, 6104-90, 6139-90, 6142-90, 6144-90, 6146-90, 6148-90, 6167-90, 6169-90, 6293-90, 6318-90, 6356-90, 6457-90, 6531-90, 6737-90, 7251-90, 18505-90, 18509-90, 7580-90, 18508-90, 18511-90
United States Tax Court
T.C. Memo 1994-26; 1994 Tax Ct. Memo LEXIS 27; 67 T.C.M. (CCH) 1995; T.C.M. (RIA) 94026; January 24, 1994, Filed *27 An appropriate order will be issued denying petitioners' Motion for Summary Judgment. For petitioners in docket Nos. 2260-90, 2417-90, and 2418-90: Mortimer Lipsky. For petitioners in docket Nos. 2417-90, 5790-90, 5791-90, 5792-90, 5830-90, 5926-90, 5927-90, 6014-90, 6015-90, 6017-90, 6083-90, 6104-90, 6109-90, 6139-90, 6141-90, 6142-90, 6143-90, 6144-90, 6145-90, 6146-90, 6147-90, 6148-90, 6149-90, 6167-90, 6168-90, 6169-90, 6276-90, 6293-90, 6355-90, 6356-90, 18505-90, 18508-90, 18509-90, and 18511-90: Charles Haydon. For petitioners in docket Nos. 6317-90, 6318-90, 6448-90, 6457-90, 6487-90, 6531-90, and 7251-90: W. Andrew Clawson. For petitioners in docket Nos. 6730-90, 6737-90, and 7580-90. [2]Sidney W. Azriliant and Bernard Kobroff. For respondent: Michael Goldbas. CLAPP
CLAPP
MEMORANDUM OPINION CLAPP, Judge: These cases are before us on petitioners' motion for summary *28 judgment. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issue is the validity of Forms 872-O [3] signed on behalf of the Transpac Drilling Ventures (Transpac) limited partnerships to extend the statute of limitations with respect to the partnerships' 1982, 1983, and 1984 tax years. The parties have agreed that, solely for the purpose of ruling as a matter of law on the motion before us, we may accept petitioners' factual allegations as true. In reaching our decision we have considered fully all of petitioners' factual allegations as set forth in their motion and in the memorandum in support thereof. We summarize those allegations here. *29 Petitioners' Factual Allegations
In 1982 and 1983 a number of Transpac partnerships having the purpose of acquiring a percentage of the working interest in oil and gas prospects were created. In 1982, 22 such Transpac partnerships were created. Each partnership offered 50 limited partnership units, at $ 54,450 per unit. The rights, benefits, and obligations of each of the partnerships were identical. In 1983, 51 such Transpac partnerships were created. Each partnership offered 35 limited partnership units, at $ 75,551 per unit. Again, the rights, benefits, and obligations of each of the partnerships were identical. In October 1983, an agent of respondent began an audit of the Transpac 1982-14 partnership. As with all of the Transpac partnerships, there was no general partner designated by the partnership as tax matters partner (TMP). Thus Morris Cofman (Cofman), the general partner having the largest net profits interest in the Transpac 1982-14 partnership at the close of the taxable year, was the TMP pursuant to section 6231(a)(7)(B). Cofman, Excelsior Oil & Gas Corp. (Excelsior), John Volatile (Volatile), Paramount Oil & Gas Corp. (Paramount), R.B. Durning Associates, *30 Brook Financial Corp., and Churchill Oil & Gas Corp. (Churchill), [4] as the general partners with the largest partnership interests in the remaining Transpac partnerships in these cases, were the original TMP's for those partnerships. Churchill was the sole general partner for two of the Transpac partnerships and was the co-general partner with Douglas C. Adams (Adams) for 17 of the Transpac partnerships. For the partnerships in which Churchill and Adams were co-general partners, Churchill had a 0.9-percent interest and Adams had a 0.1-percent interest. On February 20, 1984, Churchill forfeited its corporate charter for failure to pay its franchise taxes and failure to file its franchise tax returns. Excelsior *31 was the co-general partner with Cofman for 16 of the Transpac partnerships. Excelsior had a 0.9-percent interest in those partnerships and Cofman had a 0.1-percent interest. Excelsior was not the sole general partner for any of the Transpac partnerships. On March 1, 1987, Excelsior lost its corporate charter for failure to pay its taxes. In November 1985, respondent's audit of the Transpac partnerships was referred to respondent's Criminal Investigation Division (CID) for a criminal fraud investigation. Respondent sent letters to the Transpac limited partners in November 1985. Those covering letters requested that the limited partners execute the enclosed Forms 872 extending the statute of limitations for 1982. The letters did not reveal the possibility of a criminal investigation. Most of the Forms 872 were not signed by the limited partners. In the fall of 1985, the general partners of the Transpac partnerships started receiving information regarding the criminal investigation. In February 1986, Catherine Wilkinson (Wilkinson), who had been given powers of attorney by Cofman, Volatile, and Adams in January, received a letter from respondent advising of the criminal investigation *32 and requesting that she execute the enclosed Form 872-O to extend the limitations period for 1982. Because of a perceived conflict of interest resulting from the threatened indictment of Adams, Wilkinson sent to Volatile and Cofman the Forms 872-O that were related to the partnerships with which they were connected. On March 7, 1986, Volatile and Cofman executed Forms 2848 granting powers of attorney to Neal J. Hurwitz (Hurwitz). However, Volatile and Cofman signed those powers-of-attorney forms as the presidents of Paramount and Excelsior, respectively. On March 13, 1986, Hurwitz signed Forms 872-O for 1982. Volatile and Cofman were served with subpoenas on February 5, 1986, to appear with their records before a grand jury on March 10, 1986. Volatile met with a representative of the Government on May 7, 1986, and consented to a cooperation agreement on May 15, 1986. Volatile and Cofman subsequently were granted immunity from criminal prosecution. Volatile testified before the grand jury on June 12, 1986. In addition, he was wired to monitor telephone conversations and meetings with other individuals, recording over 120 conversations. On September 4, 1987, Adams entered *33 into a formal agreement to plead guilty to two counts of the indictment against him. In the agreement, Adams consented to cooperate with the Government in its Transpac investigation and to testify before the grand jury. Adams also agreed to file corrected individual Federal income tax returns for 1983, 1984, 1985, and 1986 and to pay all back taxes, interest and additions to tax. The Justice Department and the U.S. Attorney for the District of New Jersey agreed not to prosecute Adams further for his involvement in the Transpac partnerships. The Justice Department also agreed to make the full extent of Adams' cooperation known to the sentencing judge. On November 1, 1988, Adams received a suspended sentence and was placed on probation for the counts to which he pled guilty. During 1986 and 1987, respondent's agent solicited from the Transpac TMP's Forms 872-O pertaining to the 1983 and 1984 tax years. In March 1987, Cofman and Volatile signed the Forms 872-O extending the 1983 year, while Adams signed as president of Churchill. In March 1988, Cofman and Volatile signed the Forms 872-O extending the 1984 year, while Adams signed personally rather than as president of Churchill. *34 [5]
In November 1989, after the conclusion of the criminal prosecution, respondent mailed notices of Final Partnership Administrative Adjustments (FPAA's) for the 1982, 1983, and 1984 tax years to the TMP's and limited partners of the Transpac partnerships in question. Petitions for readjustment of partnership items were filed with this Court by the limited partners of the Transpac partnerships in question in January 1990. Discussion
The ultimate issue to be decided here is whether the Forms 872-O extended the limitations period under section 6229 relating to the assessment of income tax deficiencies attributable to partnership items for the partnerships' 1982, 1983, and 1984 tax *35 years. Petitioners argue that, for various reasons, the Forms 872-O are not valid. Each of petitioners' arguments will be discussed separately below; however, we begin by setting forth the relevant statutory provisions. Section 6229(a) establishes the general rule that: the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of -- (1) the date on which the partnership return for such taxable year was filed, or (2) the last day for filing such return for such year (determined without regard to extensions).
Exceptions to the general rule include section 6229(b)(1), which provides that: (b) EXTENSION BY AGREEMENT. -- (1) IN GENERAL. -- The period described in subsection (a) (including an extension period under this subsection) may be extended -- * * * (B) with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner (or any other person authorized by the partnership in writing to enter into such an agreement),
before the expiration *36 of such period.
Section 6231(a)(7) states that the tax matters partner shall be determined as follows: The tax matters partner of any partnership is -- (A) the general partner designated as the tax matters partner as provided in regulations, or (B) if there is no general partner who has been so designated, the general partner having the largest profits interest in the partnership at the close of the taxable year involved * * *
If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner.
Under section 301.6231(a)(7)-1T(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6791 (Mar. 5, 1987), (effective as of March 2, 1987), when "The partnership items of a tax matters partner become nonpartnership items under section 6231(c)", that partner's status as TMP terminates. Section 6231(c) provides: (c) REGULATIONS WITH RESPECT TO CERTAIN SPECIAL ENFORCEMENT AREAS. -- (1) APPLICABILITY OF SUBSECTION. -- This subsection applies in the case of -- * * * (B) criminal investigations, *37 * * * (2) ITEMS MAY BE TREATED AS NONPARTNERSHIP ITEMS. -- To the extent that the Secretary determines and provides by regulations that to treat items as partnership items will interfere with the effective and efficient enforcement of this title in any case described in paragraph (1), such items shall be treated as non-partnership items for purposes of this subchapter. (3) SPECIAL RULES. -- The Secretary may prescribe by regulation such special rules as the Secretary determines to be necessary to achieve the purposes of this subchapter in any case described in paragraph (1).
On March 2, 1987, such regulations were promulgated in section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6793 (Mar. 5, 1987): The treatment of items as partnership items with respect to a partner under criminal investigation for violation of the internal revenue laws relating to income tax will interfere with the effective and efficient enforcement of the internal revenue laws. Accordingly, partnership items of such a partner arising in any partnership taxable year ending on or before the last day of the latest taxable year of the partner to which the *38 criminal investigation relates shall be treated as nonpartnership items as of the date on which the partner is notified that he or she is the subject of a criminal investigation and receives written notification from the Service that his or her partnership items shall be treated as nonpartnership items. The partnership items of a partner who is notified that he or she is the subject of a criminal investigation shall not be treated as nonpartnership items under this section unless and until such partner receives written notification from the Service of such treatment.
Effect of Loss of Corporate Charters
Petitioners argue that some of the Forms 872-O were invalid because they were signed in the names of corporations that were no longer in existence. They contend that once Churchill and Excelsior lost their corporate charters, the corporations had no power to extend the statute of limitation for the Transpac partnerships for which they had been the original TMP's. Petitioners are, in part, correct. Under the Delaware limited partnership provisions, a corporate general partner ceases to be a general partner upon the revocation of the corporate charter if the corporate charter *39 is not reinstated within 90 days. [6]Del. Code Ann. tit. 6, sec. 17-402 (1992 Supp.). However, the Delaware limited partnership provisions permit the limited partnership to continue after a general partner has withdrawn if there is another general partner to carry on the partnership. Id.
All except two of the Transpac partnerships for which Churchill and Excelsior were general partners had an individual as a co-general partner. Upon each corporation's loss of its *40 corporate charter, the corporation ceased to be a partner in the Transpac partnerships. However, the partnerships continued with the individual general partners, Adams and Cofman, as the sole general partners. As a result, Adams and Cofman became the TMP's by operation of section 6231(a)(7)(B). We note that for the 1984 tax year, Adams signed the Forms 872-O individually, not as a representative of Churchill. Since, at that time, Churchill had lost its corporate charter and Adams was the sole general partner and the TMP, there is no question that Adams had the authority to extend the statute of limitations for the partnerships. Therefore, the Forms 872-O signed by Adams for the 1984 tax year are valid. Petitioners make it clear that Adams signed in his representative capacity for Churchill for the remaining tax years. In addition, petitioners imply that Cofman signed in his representative capacity for Excelsior for the partnerships in which Excelsior was the original TMP. We conclude that the technical manner in which Adams and Cofman signed the Forms 872-O is not controlling since the individuals who were in fact the TMP's of the partnership signed the forms with the intent *41 to extend the limitations period. Petitioners do not dispute, nor can they, that Adams and Cofman intended to extend the limitations period when they signed the Forms 872-O. Nor is there any indication that Adams and Cofman intended to act in any capacity other than as the TMP's of the Transpac partnerships. The fact that Adams and Cofman mistakenly signed the Forms 872-O as representatives of their respective corporations rather than as individuals is not sufficient to invalidate the forms. See Eversole v. Commissioner, 46 T.C. 56 (1966); Three G Trading Corp. v. Commissioner, T.C. Memo. 1988-131. However, for two of the Transpac partnerships, Transpac 1982-15 and 1982-16, Churchill was the only general partner. When Churchill lost its corporate charter, its designation as TMP terminated, and there was no longer a general partner who could act as a TMP. Therefore, Adams did not have actual authority, either individually or as a representative of Churchill, to extend the limitations period for those two partnerships. Barbados #7, Ltd. v. Commissioner, 92 T.C. 804 (1989). However, *42 the Forms 872-O executed by Adams for the Transpac 1982-15 and 1982-16 partnerships would be valid if, for example, Adams were acting in some general representative capacity in the winding up of the partnerships' affairs under the Delaware limited partnership provisions. Del. Code Ann. tit. 6, sec. 17-803 (1992 Supp.). The Delaware limited partnership provisions permit "the general partners who have not wrongfully dissolved a limited partnership or, if none, the limited partners, or a person approved by the limited partners" to wind up the affairs of the limited partnership. Winding up of the partnership's affairs includes prosecuting and defending civil, criminal, and administrative suits. Id. Moreover, section 6229(b)(1)(B) permits a person other than a TMP to extend the limitations period for the entire partnership if that person is authorized by the partnership in writing to do so. However, petitioners have not averred sufficient facts to enable us to determine whether Adams had the requisite authorization and approval to bind the partnerships. Conflict of Interest
Petitioners argue that the Forms 872-O did not effect an extension of the limitations period because *43 the TMP's who signed them lacked authority to represent petitioners because of a conflict of interest. Petitioners allege that the TMP's were under criminal investigation by respondent when they executed the consents, thereby placing their personal interests at odds with petitioners' interests. Petitioners contend that by the end of December 1985, all of the Transpac general partners who were TMP's had been notified that they were the subjects of a criminal investigation. Petitioners assert that because the TMP's were targets of the criminal investigation, they were forced to act in their own best interests, rather than in the best interests of their limited partners. Based on general principles of agency and trust law, petitioners argue that this conflict of interest removed the TMPs' authority to act on behalf of the partnerships. Petitioners also assert that a third party who deals with a TMP in a conflict-of-interest situation does so at his own peril, particularly when that party is on notice of the conflict, as was respondent. Petitioners further allege that because respondent did not want to jeopardize the criminal investigation, respondent would not have issued FPAA's *44 if the Forms 872 were not signed by the TMP's. Petitioners contend that the TMP's owe limited partners statutory and fiduciary duties, and that a promise intended to induce a fiduciary to violate his or her duties is void. According to petitioners, a TMP must keep the limited partners informed of material facts regarding administrative and judicial proceedings, including the initiation of criminal investigations, and execution of powers of attorney and Forms 872-O. Petitioners allege that respondent specifically told the TMP's not to provide information regarding the criminal investigation, thereby inducing them to violate their duties. By contrast, respondent maintains that the consent of a valid TMP is the only requirement to extend the limitations period for all of the partners in a partnership. Respondent stresses that the TMP is a statutory creature that possesses statutorily conferred authority to extend the limitations period. Sec. 6231(a)(7); sec. 6229(b)(1)(B). According to respondent, "no legitimate challenge can be made to the TMPs' authority to extend the statute of limitations." Therefore, the critical question is whether valid TMP's executed the consents. We *45 agree with respondent. The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, created unified partnership proceedings to administer disputes regarding partnership items. Id. at secs. 401-407, 96 Stat. 648-671. In order to facilitate communication, administrative resolution, and, if necessary, adjudication of such disputes, Congress created a statutory creature, the TMP. This contact person ensures that the Government always has one person with whom to communicate and negotiate. This structure is consistent with Congress' intent to simplify the process of resolving partnership disputes. See H. Conf. Rept. 97-760, at 599-610 (1982). Petitioners' analysis under agency principles would defeat Congress' intent in this regard. If respondent were required to analyze each proceeding under agency principles as well as the statutory provisions, the complexity Congress sought to eliminate would be reintroduced. Therefore, the only requisite analysis is whether the person executing the consent was a valid TMP under the statute. We note that Congress granted respondent the authority to promulgate rules under which a TMP effectively could be removed *46 in circumstances where special enforcement concerns or conflicts arose. Such regulations were promulgated effective March 2, 1987. Under those regulations, respondent must decide at what point and in what circumstances the "effective and efficient enforcement of the internal revenue laws" is impeded. Thus, Congress provided a mechanism to address the concerns that common law agency principles traditionally addressed. In these cases, the TMP's were designated by operation of the statute. Neither petitioners nor respondent designated the TMP's who executed the consents in these cases. Rather, the TMP's were the general partners with the largest profits interests as provided by section 6231(a)(7)(B). Since we have concluded that the statute requires only that the extensions be executed by the valid TMP's of the partnerships and, for all except two of the Transpac partnerships, the Forms 872-O were signed by the statutorily designated TMP or the TMP's representative, the Forms 872-O are not invalid due to any conflict of interest. Abuse of Discretion
Respondent has the option of taking steps that result in termination of the TMP's status in circumstances in which the TMP *47 is under criminal investigation. Sec. 6231(c)(1)(B); sec. 301.6231(c)-5T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6793 (Mar. 5, 1987). Petitioners claim that section 6231(c)(1)(B) and the legislative intent behind TEFRA make clear that respondent should give special consideration to a TMP under criminal investigation, and that respondent ignored this congressional mandate. Petitioners argue that not taking the appropriate steps in the instant case was an abuse of respondent's discretion. Section 6231(c)(3) states that respondent may provide rules "as the Secretary determines to be necessary to achieve the purposes of this subchapter in any case described in paragraph (1)." The legislative history explains this grant of authority as that "necessary to achieve the purpose of the bill for the tax treatment of partnership items, in * * * cases presenting special enforcement considerations." H. Conf. Rept. 97-760, at 610 (1982). Section 301.6231(c)-5T, Temporary Proced. & Admin. Regs., supra, requires that a TMP receive notice of two actions on the part of respondent before such TMP's partnership items will be treated as non-partnership items: *48 (1) that the TMP is under criminal investigation, and (2) that respondent will treat such TMP's partnership items as nonpartnership items. The notice of two actions is required because respondent must make two separate determinations. First, respondent must decide whether to criminally investigate a TMP, and then respondent must decide when such an investigation "[interferes] with the effective and efficient enforcement" of the tax treatment of partnership items and of the partnership dispute provisions in the Code. Id.
Those determinations and notifications serve to ensure that respondent continues to have a fixed contact person with whom to communicate and negotiate, as envisioned by the TEFRA provisions, until it is clear that the special enforcement considerations warrant terminating the TMP's status. Requiring notice that a criminal investigation has commenced provides assurance that the investigation has reached a point at which the special enforcement provisions should come into play. Similarly, requiring additional notice that the TMP's partnership items shall be treated as nonpartnership items gives respondent the opportunity to evaluate each criminal investigation *49 to determine if it will, in fact, interfere with the effective and efficient enforcement of the Internal Revenue laws. Petitioners fail to allege facts sufficient to establish that respondent acted in a manner inconsistent with those statutory and regulatory purposes. Petitioners' position rests upon the notion that the initiation of a criminal investigation, in and of itself, should result in the termination of a TMP's status. As noted, however, the regulatory structure requires more. Specifically, petitioners must show that respondent could have come to no other conclusion except that the criminal investigation in these cases would interfere with the effective and efficient enforcement of the Internal Revenue laws. Petitioners have failed to make such a showing. Petitioners cite Computer Programs Lambda, Ltd. v. Commissioner, 89 T.C. 198 (1987), and our discussion regarding the incompatibility of a TMP's fiduciary duty and a TMP's bankruptcy status to support their argument. However, we note that the case of a criminal investigation and its effect on the TMP's status are clearly distinguishable from the case of a bankruptcy filing and its effect *50 on the TMP's status. A bankruptcy filing has an immediate and substantial effect on the TMP's partnership items and the operation of the partnership. The impact of a TMP's bankruptcy filing on the effective and efficient enforcement of the Internal Revenue laws is immediate and determinable. Therefore, it is appropriate in such circumstances for the regulations to provide that, upon the occurrence of a TMP's bankruptcy filing, the TMP's partnership items will be treated as nonpartnership items, thereby terminating the TMP's status as such. Secs. 301.6231(c)-7T(a), 301.6231(a)(7)-1T(1)(4), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6791 (Mar. 5, 1987). However, as we described above, the concerns are different in the case of a criminal investigation, and, therefore, Computer Programs Lambda, Ltd. is distinguishable. Equitable Estoppel
Petitioners also assert that because respondent did not procure the Forms 872-O in good faith, respondent should now be estopped from relying on them. To establish a prima facie equitable estoppel case, petitioners must show: (1) A material misrepresentation by respondent or her agent; (2) an absence by the *51 taxpayer of contrary knowledge in circumstances where he may reasonably act in reliance; (3) actual reliance by the taxpayer; (4) detriment to the taxpayer; and (5) circumstances in which the absence of equitable relief would lead to an unconscionable result. Tonkonogy v. United States, 417 F.Supp. 78, 79 (S.D.N.Y. 1976). "The doctrine of equitable estoppel is applied against the government 'with the utmost caution and restraint.'" Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987) (quoting Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977)). The misrepresentation to which petitioners point is one of silence. According to petitioners, the limited partners were not informed by respondent about the criminal investigation, and they were told to consult with the TMP's. Petitioners allege that, separately, the TMP's were told not to disclose the fact that they were under criminal investigation. Petitioners claim that the limited partners had no other way of knowing about the criminal investigation and relied on the *52 "silent misrepresentation" by waiting and taking no action, assuming their rights and interests were being protected by the TMP's. Petitioners argue that they have been prejudiced in their ability to prosecute these cases because of respondent's delay of trial for more than 6 years and that they are now subject to onerous interest charges. Petitioners contend that they may have been able to recover a portion of their investment had respondent not "put the [Transpac] partnerships out of business." Petitioners contend that the facts alleged in these cases clearly indicate that the absence of equitable relief would create an unconscionable result in that the criminal investigation impaired the ability of the TMP's to act as fiduciaries and effective managers and prevented the limited partners from pursuing alternative courses of action. Respondent disputes that the facts alleged establish that the elements of equitable estoppel have been met. With regard to the existence of a material misrepresentation, respondent makes several arguments. The arguments that are most relevant are: (1) Proof of material misrepresentation requires a showing of "affirmative misconduct" by the Government *53 which petitioners have not made; (2) respondent's agents acted appropriately with regard to the limited partners' inquiries about the civil audit, and they had no duty to disclose the criminal investigation; and (3) petitioners were protected by duly authorized representatives, their attorneys, who knew about the criminal investigation. While we do not decide the propriety of respondent's analysis with regard to the first two arguments, we agree with respondent's third point. Petitioners' conclusion that there was misrepresentation by silence depends on a finding that respondent acted to keep the limited partners in the dark regarding the criminal investigation. The facts do not support such a finding. Petitioners admit that the attorneys who were acting as petitioners' representatives received requests for extensions of the limitations period which revealed the criminal investigation. There is no allegation that respondent acted in any way to prevent those representatives from revealing the investigation to the limited partners. We note that the TMP's obtained separate counsel as the criminal investigation proceeded, eliminating any possibility that petitioners' attorneys were *54 acting for the TMP's individually. Moreover, because petitioners' attorneys knew about the criminal investigation, the second element of equitable estoppel, absence of contrary knowledge, is not satisfied. The information known by petitioners' attorneys is imputed to the limited partners because the attorneys were authorized to act on petitioners' behalf. Consequently, any inaction on the part of the limited partners was not due to lack of knowledge, but rather to their attorneys' failure to inform them of known facts. Finally, we find that petitioners have not alleged facts sufficient to establish that these are circumstances in which the absence of equitable relief would lead to an unconscionable result. To the extent that petitioners argue that respondent's criminal investigation prevented the TMP's from effectively managing the Transpac partnerships and, thus, precipitated the failure of the partnerships, the argument is untenable. In essence, petitioners are arguing that the Government should be held responsible for the failure of a business when the Government acts against that business in order to enforce the law. The Government does not bear that responsibility; proper *55 law enforcement cannot lead to an unconscionable result. To the extent that petitioners argue that the criminal investigation precluded the TMP's from properly executing their fiduciary duties, we also disagree. Petitioners allege no facts indicating that respondent's agents forced, induced, or asked the TMP's to do anything inconsistent with their fiduciary duties. We cannot conclude that extending the limitations period was inconsistent with the Transpac partnerships' interests. [7]
Furthermore, denying equitable relief in these cases neither bars petitioners from receiving their day in *56 court nor prevents them from proceeding with their cases on the merits. We merely require petitioners to prove their substantive claims rather than conclude these cases on procedural grounds. Given the circumstances, we do not find such a result unconscionable. We find that petitioners have failed to allege facts sufficient to establish at least three of the elements of equitable estoppel. Because petitioners must prove all five elements of equitable estoppel in order to succeed, respondent is not estopped from relying on the Forms 872-O. Duress
Because a Form 872-O is a voluntary waiver of a defense, it must be voluntary and not executed under duress. Petitioners contend that the TMP's, as subjects of a criminal investigation, were pressured by respondent to cooperate and were forced to sign the Forms 872-O or face possible criminal sanctions. As respondent points out, however, the threat of lawful action against a taxpayer does not constitute duress. Griffith v. Commissioner, T.C. Memo. 1988-445 (citing Burnet v. Chicago Ry. Equipment Co., 282 U.S. 295 (1931)), supplemented by T.C. Memo. 1989-70. *57 In defining duress, it has been said: if an act of one party deprives another of his freedom of will to do or not to do a specific act the party so coerced becomes subject to the will of the other, there is duress, and in such a situation no act of the coerced person is voluntary and contracts made in such circumstances are void because there has been no voluntary meeting of the minds of the parties thereto. [Diescher v. Commissioner, 18 B.T.A. 353, 358 (1929); citations omitted.]
Petitioners do not allege that the criminal investigation was illegal or even improper. There are no allegations that respondent's agents ever threatened any specific action, legal or illegal, if the TMP's refused to execute the Forms 872-O. Petitioners do not cite any specific act or acts on respondent's part, beyond the existence of the criminal investigation itself, that coerced or in any way removed the TMP's "freedom of will" to execute the Forms 872-O. Respondent's ongoing criminal investigation of the TMP's could not, in and of itself, constitute duress forcing the TMP's to do anything that they would not have done absent the investigation. Therefore, *58 the Forms 872-O are not invalid as products of duress. Imperfect Powers of Attorney
Petitioners contend that the Forms 872-O pertaining to the 1982 tax year for several of the Transpac partnerships were not executed by properly authorized agents of the TMP. Petitioners allege that TMP's Volatile and Cofman signed respondent's standard power-of-attorney Forms 2848 in their capacities as officers of their respective closely held corporations rather than in their individual capacities as general partners and TMP's of the partnerships. Hurwitz signed the Forms 872-O pertaining to the 1982 tax year on petitioners' behalf. Petitioners claim that, because the Forms 2848 were incorrectly executed by Cofman and Volatile, Hurwitz had no power to act on behalf of the partnerships, and the Forms 872-O signed by Hurwitz are therefore invalid. Respondent argues that the intent of Volatile and Cofman clearly was to grant Hurwitz powers of attorney, and that this intent, rather than a minor procedural defect in the execution of two Forms 2848, is controlling in this instance. We agree. Petitioners do not contend that Volatile and Cofman had no actual intent to grant powers of attorney *59 to Hurwitz, and logically, they could not make such an argument. Petitioners provide no explanation as to why Volatile and Cofman signed the power-of-attorney forms as officers of "wholly unrelated" corporations. The only likely explanation is that it was simply a mistake, and that Volatile and Cofman actually intended to grant powers of attorney in their capacities as TMP's of the partnerships for which Hurwitz signed the Forms 872-O. As we held above, such a mistake does not defeat the grant of the powers. Eversole v. Commissioner, 46 T.C. 56 (1966); Ryan v. Commissioner, T.C. Memo. 1991-49; Griffith v. Commissioner, supra; Three G Trading Corp. v. Commissioner, T.C. Memo. 1988-131. Moreover, Volatile's and Cofman's subsequent action (execution of the Forms 872-O for 1983 and 1984) and inactions (failure to disavow the powers of attorney or the Forms 872-O for 1982) not only support the conclusion that a grant of actual authority was intended, but further indicate a ratification of the powers of attorney. Mishawaka Properties Co., v. Commissioner, 100 T.C. 353 (1993); *60 Kraasch v. Commissioner, 70 T.C. 623 (1978). In Mishawaka Properties, 100 T.C. at 365-66, we held that implied ratification principles may be applied in a TEFRA proceeding. We conclude that the defects of form in the execution of the Forms 2848 do not render invalid the granting of the powers and do not render invalid the Forms 872-O executed by Hurwitz. Constitutional Issues
Petitioners further assert that they were deprived of their right to claim an affirmative limitations defense in violation of the Due Process and Equal Protection clauses of the U.S. Constitution. The right to an affirmative defense could be waived only by a limited partner or his agent, and petitioners contend that the TMP's were acting as agents of the Government, not as agents of petitioners. As discussed above, we have concluded that petitioners have not alleged facts sufficient to find that the TMP's did not have the authority under section 6229 to extend the limitations period. The statutory structure specifically provides the mechanism by which an agent of the partnership can waive the limitations defense. Respondent cannot violate *61 petitioners' constitutional rights by acting consistently with a constitutional statute. Petitioners point us to several cases that are inapposite. In each of those cases, the defendant's constitutional right against unreasonable searches and seizures was waived by someone other than the defendant. Petitioners' citations are not on point for two reasons: (1) The waiver of a statutory defense is not comparable to the waiver of a constitutional right, and (2) we have held that the TMP's were acting as petitioners' agents, not as respondent's agents. Consequently, no constitutional rights violation occurred. An appropriate order will be issued denying petitioners' Motion for Summary Judgment. APPENDIX Transpac Drilling Venture 1982-13, Timothy Kazurinsky and Alvin Boyd, Partners Other Than the Tax Matters Partner, docket No. 2417-90; Transpac Drilling Venture 1982-12, Paul Savelleas, Nicholas Spanos, and Edward R. Murphy, Partners Other Than the Tax Matters Partner, docket No. 2418-90; Transpac Drilling Venture 1982-11, Howard J. and Jaynee Behlman, Partners Other Than the Tax Matters Partner, docket No. 5790-90; Transpac Drilling Venture 1982-15, Thaddeus A. and Stella M. *62 Dukes, Partners Other Than the Tax Matters Partner, docket No. 5791-90; Transpac Drilling Venture 1982-30, Franklin H. and Susan Ornstein, Partners Other Than the Tax Matters Partner, docket No. 5792-90; Transpac Drilling Venture 1982-32, Arnold K. and Julia E. Jones, Partners Other Than the Tax Matters Partner, docket No. 5830-90; Transpac Drilling Venture 1982-14, Allan and Caroline Fox, Partners Other Than the Tax Matters Partner, docket No. 5926-90; Transpac Drilling Venture 1982-10, Edward W. and Shirley M. Bouclin, Partners Other Than the Tax Matters Partner, docket No. 5927-90; Transpac Drilling Venture 1983-6, Louis A. and Nancie Salamone, Partners Other Than the Tax Matters Partner, docket No. 6014-90; Transpac Drilling Venture 1983-7, George and Anna Ganzberg, Partners Other Than the Tax Matters Partner, docket No. 6015-90; Transpac Drilling Venture 1983-41, Dennis A. and Barbara D. Konner, Partners Other Than the Tax Matters Partner, docket No. 6017-90; Transpac Drilling Venture 1983-44, Richard T. Kutnick, A Partner Other Than the Tax Matters Partner, docket No. 6083-90; Transpac Drilling Venture 1983-3, David R. and Marie R. Fraley, Partners Other Than the Tax Matters *63 Partner, docket No. 6104-90; Transpac Drilling Venture 1983-8, Ben C. and F. Barbara Shirley, Partners Other Than the Tax Matters Partner, docket No. 6109-90; Transpac Drilling Venture 1983-24, Julie Floyd, A Partner Other Than the Tax Matters Partner, docket No. 6139-90; Transpac Drilling Venture 1983-39, George J. and Barbara M. Ohntrup, Partners Other Than the Tax Matters Partner, docket No. 6141-90; Transpac Drilling Venture 1983-22, Donald H. and Shirley M. King, Partners Other Than the Tax Matters Partner, docket No. 6142-90; Transpac Drilling Venture 1983-01, Joseph F. Grady, Jr. and Nghinh Kim Grady, Partners Other Than the Tax Matters Partner, docket No. 6143-90; Transpac Drilling Venture 1983-67, Joann Ayer and C.D. Ayer, Partners Other Than the Tax Matters Partner, docket No. 6144-90; Transpac Drilling Venture 1983-40, Pierre and Marsha Guibor, Partners Other Than the Tax Matters Partner, docket No. 6145-90; Transpac Drilling Venture 1983-12, Joseph A. and Judi A. Almaguer, Partners Other Than the Tax Matters Partner, docket No. 6146-90; Transpac Drilling Venture 1983-36, Kenneth and Gail Gerwin, Partners Other Than the Tax Matters Partner, docket No. 6147-90; Transpac *64 Drilling Venture 1983-11, William A. and Marie A. Holmes, Partners Other Than the Tax Matters Partner, docket No. 6148-90; Transpac Drilling Venture 1983-20, Marc N. and Carol S. Cohen, Partners Other Than the Tax Matters Partner, docket No. 6149-90; Transpac Drilling Venture 1983-68, Jon F. and Patricia E. Brown, Partners Other Than the Tax Matters Partner, docket No. 6167-90; Transpac Drilling Venture 1983-63, Ashok H. and Jayshree A. Patel, Partners Other Than the Tax Matters Partner, docket No. 6168-90; Transpac Drilling Venture 1983-64, Carol and Sonia A. Levin, Partners Other Than the Tax Matters Partner, docket No. 6169-90; Transpac Drilling Venture 1983-5, Rajendra K. and Manejula Bansal, Partners Other Than the Tax Matters Partner, docket No. 6276-90; Transpac Drilling Venture 1983-13, Larry J. and Diane L. Robins, Partners Other Than the Tax Matters Partner, docket No. 6293-90; Transpac Drilling Venture 1983-16, Jermey and Phyllis King, Thomas D. and Phyllis V. Neal, and Richard J. and Marya Thomas Coburn, Partners Other Than the Tax Matters Partner, docket No. 6317-90; Transpac Drilling Venture 1983-23, John M. and Ruthann Boyle, Donald D. and Ann S. Harper, Richard E. and *65 Christine A. Lieberman, and Edward P. Tolley, Jr. and Nancy J. Tolley, Partners Other Than the Tax Matters Partner, docket No. 6318-90; Transpac Drilling Venture 1983-19, James L. and Anna C. Goettee, Partners Other Than the Tax Matters Partner, docket No. 6355-90; Transpac Drilling Venture 1983-15, Norman and Marlis Winter, Partners Other Than the Tax Matters Partner, docket No. 6356-90; Transpac Drilling Venture 1983-43, Joseph L. Yousem and Cheri D. Renfroe, Michael and Mary Louise Baghdoian, Douglas T. Lo, Estate of Nicholas Nardella, Deceased, Nellie Nardella, Executrix, Nellie Nardella, and Jack G. Banner and Kathleen C. Banner, Partners Other Than the Tax Matters Partner, docket No. 6448-90; Transpac Drilling Venture 1983-10, Frank Nizarre, A Partner Other Than the Tax Matters Partner, docket No. 6457-90; Transpac Drilling Venture 1983-21, Harvey C. and Carla J. Bennett, Charles R. and Mary H. Curran, and Robert L. and Ivy Kennedy, Partners Other Than the Tax Matters Partner, docket No. 6487-90; Transpac Drilling Venture 1983-28, Terence and Ellen O'Neil, Partners Other Than the Tax Matters Partner, docket No. 6531-90; Transpac Drilling Venture 1983-26, Gerard F. Stoddard, *66 A Partner Other Than the Tax Matters Partner, docket No. 6730-90; Transpac Drilling Venture 1983-4, Robert M. Lehrer, A Partner Other Than the Tax Matters Partner, docket No. 6737-90; Transpac Drilling Venture 1983-38, Roberta Driver, Estate of Robert L. Driver, Deceased, William N. Green, Executor, and Gregory L. and Cynthia J. Judd, Partners Other Than the Tax Matters Partner, docket No. 7251-90; Transpac Drilling Venture 1983-25, Robert E. Ivy, A Partner Other Than the Tax Matters Partner, docket No. 7580-90; Transpac Drilling Venture 1982-18, Kevin P. and Gertrude Wright, Partners Other Than the Tax Matters Partner, docket No. 18505-90; Transpac Drilling Venture 1983-49, Albert D. and Luella L. Eshelman, Partners Other Than the Tax Matters Partner, docket No. 18508-90; Transpac Drilling Venture 1982-7, Richard S. and Marie J. Polcari, Partners Other Than the Tax Matters Partner, docket No. 18509-90; and Transpac Drilling Venture 1982-08, Albert D. and Luella L. Eshelman, Partners Other Than the Tax Matters Partner, docket No. 18511-90. Footnotes
1. Captions of the cases are listed in the Appendix.↩
2. Richard J. Sapinski, for participants Alvin Cohen and Nili Cohen in docket Nos. 6014-90 and 6276-90; and John J. White, Jr., for participant and Tax Matters Partner, Crestwood Hospitals, Inc., in docket Nos. 6143-90, 6168-90, and Tax Matters Partner, Lindsey & Hall, Inc., in docket No. 7251-90.↩
3. A Form 872 is the general consent form used by respondent to secure from a taxpayer an agreement to extend the limitations period. A Form 872-O is a variation of the general Form 872; the Form 872-O is the consent form designated by respondent to effect an extension of the limitations period for all partners of a partnership pursuant to sec. 6229(b)(1)(B).↩
4. Cofman was president and controlling shareholder of Excelsior Oil & Gas Corp.; Volatile was president of Paramount Oil & Gas Corp.; Ronald B. Durning was president of R. B. Durning Associates and Brook Financial Corp.; and Douglas C. Adams was president and controlling shareholder of Churchill Oil & Gas Corp.↩
5. Petitioners do not state whether Cofman and Volatile signed individually or in their representative capacities for their respective corporations. However, petitioners imply that, where the corporations were the original TMP's for the partnerships, Cofman and Volatile signed as representatives of their respective corporations.↩
6. We note that on Mar. 2, 1987, after Churchill and Excelsior lost their corporate charters, the Secretary promulgated regulations which provided that a TMP's designation terminates upon "The liquidation or dissolution of the tax matters partner, if the tax matters partner is an entity." Sec. 301.6231(a)(7)-1T(1)(3) and (m)(3), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6792↩ (Mar. 5, 1987). That regulation is consistent with the rule that the loss of the corporate charter by a general partner is an act of withdrawal.
7. In fact, petitioners probably benefited from the extensions because, if the limitations periods had not been extended, respondent likely would have issued the FPAA's immediately. Respondent did just that with the Transpac East partnerships, whose general partner was deceased at the time of the investigation. The extensions put off petitioners' day of reckoning and gave petitioners more time to try to negotiate a settlement.↩